Filed 9/24/25  Kaye v. JPMorgan Chase Bank CA4/1
# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| MARC D. KAYE, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> JPMORGAN CHASE BANK, N.A., <br><br> Defendant and Respondent. | D084131 <br><br><br> (Super. Ct. No. 37-2019-00062677-CU-FR-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Keri G. Katz, Judge.  Affirmed.

Noon & Associates and Timothy S. Noon for Plaintiff and Appellant.

Parker Ibrahim & Berg, John M. Sorich, and Matthew S. Henderson for Defendant and Respondent.

Marc D. Kaye appeals from a judgment of dismissal after the trial court sustained a demurrer to his second amended complaint against JPMorgan Chase National Corporate Services, Inc. (Chase) without leave to amend. The trial court ruled that it lacked jurisdiction under the federal Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA) because Kaye's claims against Chase relate to acts or omissions of Washington

Mutual Bank (WaMu), a failed financial institution placed under receivership of the Federal Deposit Insurance Corporation (FDIC). (12 U.S.C. § 1821(d)(13)(D)(ii).) We affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

The following facts are taken from the second amended complaint that was the subject of the challenged ruling.

A. *Allegations of Wrongdoing by WaMu*

Kaye is a developer of residential properties. From 1992 through 2008, he took out numerous loans from WaMu to obtain funding for his construction projects. His home in La Jolla was also secured by a deed of trust for a note prepared by WaMu.

In 2006, Kaye began construction on a new home in Calistoga. WaMu promised to give Kaye a construction loan in the approximate amount of $6.5 million and then convert the construction loan into a takeout loan, subject to appraisal of the completed home. In reliance on WaMu's commitments, Kaye proceeded with construction of the Calistoga home using substantial out-of-pocket and other private funding.

In April 2007, however, WaMu only funded a construction loan of approximately $4.9 million. The WaMu loan officer suggested to Kaye that he make up part of the difference with a $400,000 modification of an existing WaMu home equity line of credit (HELOC) secured by his La Jolla home. Kaye requested a HELOC advance in the amount of $400,000.

In February 2008, after completion of the Calistoga home, WaMu issued Kaye a takeout loan of about $4.9 million, which was short of what WaMu had promised to Kaye. Kaye had to cover the remaining balance of the shortfall with other resources. At the time, Kaye believed the WaMu

2

takeout loan was a low interest loan, but it turned out to be an "Option ARM adjustable rate mortgage."

The Option ARM was WaMu's "flagship mortgage product." It was an adjustable rate mortgage that "in most cases was a negative amortizing loan."[1] The "option" in the loan name referred to the borrower's option to choose each month between different types of payments: (1) payments that would pay off the loan in either 15 or 30 years; (2) an interest-only payment; or (3) a minimum payment that did not cover even the interest owed. If the borrower chose the minimum payment option, the unpaid interest would be added to the loan's principal, causing the principal to increase rather than decrease over time.

According to the complaint, negative amortizing loans are often considered "predatory loans" because they place the borrower in a high probability of default and benefit the lender by, among other things, receipt of compounded interest. Moreover, "these egregious benefits were cemented in, with stiff pre-payment penalties, guaranteeing high returns, even after default and loan acceleration."

According to the complaint, WaMu's actions "harmed Mr. Kaye by placing him in a toxic/predatory mortgage." WaMu "wronged him by putting him into an escalating ARM take out loan," which "was a predatory loan." At oral argument in this appeal, Kaye's counsel referred to this as a "fraudulent" and "illegal" loan.

---

[1] Kaye's opening brief defines a "negative amortization loan" as "a loan where the monthly payments are not enough to cover the interest on the loan resulting in the loan balance increasing. The unpaid interest is added to the loan balance which increases the amount owed [resulting] in higher interest expenses and an increasing loan balance."

3

B. *Demise of WaMu and Acquisition of Loans by Chase*

In September 2008, the FDIC was appointed as receiver of WaMu. On the same day, the FDIC transferred substantially all of Wamu's assets and liabilities to Chase, including WaMu's interest in Kaye's takeout and HELOC loans.

C. *Allegations of Wrongdoing by Chase*

In October 2008, Chase issued a press release regarding its acquisition of WaMu's mortgage portfolio. It stated in relevant part: "After reviewing the alternatives that were being offered to customers, Chase decided to add more modification choices. All the offers will eliminate negative amortization and are expected to be more affordable for borrowers in the long term." According to the press release, Chase would "[e]xpand the range of financing alternatives offered to modify pay-option ARMs" and "[a]ll the alternatives eliminate negative amortization." The press release further stated that Chase would "[s]ystematically review its entire mortgage portfolio to determine proactively which homeowners are most likely to require help – and try to provide it before they are unable to make payments" and would "[p]roactively reach out to homeowners to offer pre-qualified modification such as interest-rate reductions and/or principal forbearance."

When Chase issued this press release, it "knew it had acquired a portfolio that contained such predatory, toxic loans . . . ." By October or November 2008, Chase became aware of Kaye's Option ARM takeout loan with WaMu and "knew it was a predatory loan." However, Chase did not reach out to Kaye to provide alternatives to the loan as promised. Beginning in 2008, Chase also became aware that Kaye was struggling to make loan payments, yet it failed to investigate. If Chase had reviewed or audited the file, "it would have discovered that WaMu not only harmed Mr. Kaye by

4

placing him in a toxic/predatory mortgage, but proceeds from this loan only partially repaid [the] construction loan WaMu previously approved and funded, thereby requiring [Kaye] to borrow funds from his HELOC (also 'inherited' by Chase) to fund the portion of the construction, which WaMu refused to 'term out,' as is standard in the industry." According to Kaye's complaint, "WaMu had wronged him by putting him into an escalating ARM take out loan, and by October 31, 2008, Chase knew it was a predatory loan, agreed to eliminate it and failed to do so."

Kaye's situation was exacerbated by the HELOC loan he took out to make up for WaMu's shortfall in construction funding and the adverse pressure of the high-floating interest rate. If Chase had done a reasonably diligent review or audit, it would have discovered this and provided Kaye an "opportunity to wrap or fold that loan into a modification to provide relief." "Chase failed to do any such review and/or make any such offer to Mr. Kaye and breached its promise of ending WaMu's predatory lending practices, review[ing] all of its loan file[s] and reach[ing] out to the borrowers struggling on payments to provide relief . . . . Instead, in breach of its promises, it continued to collect on both loans high interest rates and ignore Mr. Kaye's needs for relief."

D.     *Trial Court Proceedings*

Kaye filed his initial complaint against Chase in November 2019.  After several motions on the pleadings, Kaye filed a second amended complaint in November 2023.  The second amended complaint asserted claims against Chase for fraud, violation of Business and Professions Code section 17200, and negligence.  Kaye sought damages or restitution in the entire amounts he had paid on both the ARM takeout loan and the HELOC after Chase represented that it would "eliminate such toxic loans."

Chase filed a demurrer to the second amended complaint on multiple grounds, including that Kaye's claims were jurisdictionally barred for failure to exhaust administrative remedies with the FDIC under FIRREA.  In opposition, Kaye argued that the FIRREA jurisdictional bar did not apply under the holding of *Benson v. JPMorgan Chase Bank, N.A.* (9th Cir. 2012) 673 F.3d 1207 (*Benson*), because he had alleged wrongful conduct by Chase that was independent of WaMu's conduct.

The trial court sustained Chase's demurrer without leave to amend under FIRREA.  The court rejected Kaye's argument that FIRREA's exhaustion requirement did not apply because he had alleged independently wrongful conduct by Chase.  The court reasoned: "A review of the SAC shows that each of these causes of action is premised on the terms of Plaintiff's agreements with WaMu.  As such, each of these causes of action is barred by the FIRREA defense."  The court also noted "that the damages alleged all arise out of Plaintiff's loan agreements with WaMu."  The court concluded that "*Benson* does not allow for a finding of independently wrongful conduct in these circumstances."  The court also denied leave to amend because Kay had failed to proffer any facts to cure this pleading deficiency.  Based on its demurrer ruling, the court entered a judgment of dismissal in favor of Chase.

6

DISCUSSION

Kaye contends the trial court erred by ruling that his claims were jurisdictionally barred under FIRREA for failure to exhaust his administrative remedies with the FDIC. We review an order sustaining a demurrer de novo. (*Balikov v. S. Cal. Gas Co.* (2001) 94 Cal.App.4th 816, 819.)

Congress enacted FIRREA in 1989 "in the midst of the savings and loan insolvency crisis to enable the FDIC . . . to expeditiously wind up the affairs of literally hundreds of failed financial institutions throughout the country." (*Freeman v. FDIC* (D.C. Cir. 1995) 56 F.3d 1394, 1398.) "FIRREA confers broad powers on the FDIC in its capacity as receiver for failed depository institutions." (*Westberg v. FDIC* (D.C. Cir. 2014) 741 F.3d 1301, 1303 (*Westberg*).) These powers include adjudicating claims against failed banks. (*Ibid.*)

FIRREA "created an administrative review process for the resolution of claims against a failed bank." (*Neman v. Commercial Capital Bank* (2009) 173 Cal.App.4th 645, 648.) "To effectuate its goals of managing claims in an expeditious and efficient manner through an administrative process, Congress placed jurisdictional limits on the power of the . . . courts to review matters involving failed savings and loans under FIRREA." (*Brady Dev., Co. v. Resolution Trust Corp.* (4th Cir. 1994) 14 F.3d 998, 1003.) Specifically, FIRREA requires a plaintiff to exhaust administrative remedies with the FDIC and precludes courts from exercising jurisdiction over certain types of claims involving a failed bank. (*Benson, supra*, 673 F.3d at p. 1211.) The relevant FIRREA provision covers two categories of claims as follows:

> "Limitation on judicial review. Except as otherwise provided in this subsection, no court shall have jurisdiction over—

7

"(i) any claim or action for payment from, or any action seeking a determination of rights with respect to, the assets of any depository institution for which the [FDIC] has been appointed receiver, including assets which the [FDIC] may acquire from itself as such receiver; or

"(ii) any claim relating to any act or omission of such institution or the [FDIC] as receiver." (12 U.S.C. § 1821(d)(13)(D).)

This provision is jurisdictional: a plaintiff's failure to exhaust administrative remedies under FIRREA deprives the court of subject matter jurisdiction over these types of claims. (*Saffer v. JP Morgan Chase Bank, N.A.* (2014) 225 Cal.App.4th 1239, 1248–1253 (*Saffer*).) "The primary purpose underlying FIRREA's exhaustion scheme is to allow [the FDIC] to perform its statutory function of promptly determining claims so as to quickly and efficiently resolve claims against a failed institution without resorting to litigation." (*Rosa v. Resolution Trust Corp.* (3d Cir. 1991) 938 F.2d 383, 396.) "Congress emphasized that the 'exhaustion requirement' was a key linchpin in achieving the legislative goal of resolving the 'bulk of claims against failed financial institutions expeditiously and fairly' through the administrative process 'without unduly burdening the [courts].' " (*Feise v. Resolution Trust Corp.* (E.D. Cal. 1993) 815 F.Supp. 344, 348.)

This case involves the second category of claims subject to FIRREA's jurisdictional provision—for claims relating to an act or omission of a failed institution. (12 U.S.C. § 1821(d)(13)(D)(ii).) "That provision distinguishes claims on their factual bases rather than on the identity of the defendant: It asks whether claims 'relate to any act or omission' of a failed institution or the FDIC. Notably, the provision does not make any distinction based on the identity of the party from whom relief is sought." (*Benson, supra*, 673 F.3d at p. 1212.) Accordingly, state and federal courts have uniformly ruled that this

8

provision applies to claims asserted against a successor bank that relate to acts or omissions of the failed institution or the FDIC as receiver of the failed institution. (*Id.* at pp. 1214–1215, citing *Vill. of Oakwood v. State Bank & Trust Co.* (6th Cir. 2008) 539 F.3d 373, 386 (*Oakwood*); *Am. Nat'l Ins. Co. v. FDIC* (D.C. Cir. 2011) 642 F.3d 1137, 1144; see also *Westberg, supra*, 741 F.3d at p. 1306; *Farnik v. FDIC* (7th Cir. 2013) 707 F.3d 717, 722–723 (*Farnik*); *Tellado v. IndyMac Mortg. Servs.* (3d Cir. 2013) 707 F.3d 275, 280 (*Tellado*); *Saffer, supra*, 224 Cal.App.4th at p. 1256 ["the statutory provision, by its plain language, applies with equal force to a successor in interest to the failed institution"].)

FIRREA's jurisdictional bar, however, does not apply to all claims against a successor bank involving loans issued by a failed bank. "Claims of independent misconduct by an institution that purchases a failed bank are not covered by FIRREA's exhaustion requirement." (*Benson, supra*, 673 F.3d at p. 1215.) "[A] claim alleging liability based *only* on the post-purchase misconduct of a purchasing bank would not 'relate to' acts or omissions of a failed bank for purposes of FIRREA." (*Id.* at p. 1216, italics added.)

Under these authorities, the dispositive question here is whether Kaye's claims against Chase relate to acts or omissions of WaMu or are instead based only on "independent" post-purchase wrongdoing by Chase. If the former, Kaye's claims are jurisdictionally barred by his failure to exhaust administrative remedies with the FDIC.

We conclude the trial court correctly ruled that the alleged wrongdoing by Chase relates to and is not independent of the acts or omissions of WaMu. As to WaMu, the complaint alleges that it committed wrongdoing by issuing Kaye a predatory takeout loan with negative amortization, breaching its promise of full funding for the Calistoga construction, and forcing Kaye to

9

make up the shortfall by taking out a high interest HELOC on his La Jolla residence. As to Chase, the complaint alleges that after it acquired these two loans from WaMu, it breached its promise to end WaMu's predatory lending practices, proactively review its loan files, and reach out to Kaye to modify the WaMu loans on more favorable terms. If Chase had conducted a proper review as promised, according to the complaint, "it would have discovered that WaMu . . . harmed Mr. Kaye by placing him in a toxic/predatory mortgage" and "requiring him to borrow funds from his HELOC (also 'inherited' by Chase) to fund the portion of the construction, which WaMu refused to 'term out,' as is standard in the industry." The complaint further alleges that "WaMu had wronged him by putting him into an escalating ARM take out loan, and by October 31, 2008, Chase knew it was a predatory loan, agreed to eliminate it and failed to do so." These allegations form the basis for all of Kaye's claims against Chase.

These claims against Chase relate to and are not independent of WaMu's conduct because they are "wholly dependent upon [WaMu]'s wrongdoing" in issuing the predatory takeout loan to Kaye and forcing him to take out the HELOC in the first place. (*Tellado, supra*, 707 F.3d at p. 280.) "By relying on WaMu's alleged wrongdoing, [Kaye's] claims plainly 'relat[e] to any act or omission' of 'a depository institution for which the [FDIC] has been appointed receiver.' " (*Benson, supra*, 673 F.3d at p. 1215; see also *Shaw v. Bank of America Corp.* (9th Cir. 2019) 946 F.3d 533, 540–541 [plaintiff's claim against successor bank for loan rescission jurisdictionally barred by FIRREA because it related to WaMu's alleged failure to comply with statutory disclosure requirements].)

Our conclusion is also consistent with federal authorities holding that a claim alleging failure to remedy or cure the pre-receivership wrongdoing of a

10

failed bank falls within FIRREA because "the genesis of the claim is the prereceivership misconduct by the failed bank[]." (*Tri-State Hotels v. FDIC* (8th Cir. 1996) 79 F.3d 707, 713–714; see also *SunSouth Bank v. First NBC Bank* (11th Cir. 2017) 678 Fed.Appx. 811, 813–814; *Triad Bank v. First-Citizens Bank & Trust Co.* (D.Colo. 2015) 85 F.Supp.3d 1258, 1267 [" '[p]ermitting [Triad] to recharacterize its claims as [claims relating to the independent acts of the successor bank] would . . . effectively eviscerate the claims process, because every plaintiff could (and would) simply challenge the [successor bank's] failure to reverse the failed bank's fraudulent actions rather than challenging the bank's fraudulent actions directly' "].)

Kaye is suing Chase for its failure to remedy WaMu's allegedly wrongful pre-receivership conduct, specifically by failing to modify the WaMu loans on more favorable terms. FIRREA's jurisdictional provision applies because the genesis of Kaye's claims against Chase is the pre-receivership wrongdoing of WaMu in issuing the loans and breaching its promise to fully fund the Calistoga construction. Moreover, the complaint specifically alleges that if Chase had fulfilled its alleged promise to review its entire WaMu loan portfolio, it "would have discovered" WaMu's wrongdoing against Kaye and remedied it. As alleged, therefore, Kaye's claims against Chase are not "based *only* on post-purchase misconduct of a purchasing bank." (*Benson, supra*, 673 F.3d at p. 1216, italics added; see also *Tellado, supra*, 707 F.3d at p. 280 [plaintiff's claim against successor bank for cancellation of loan was "not a claim of independent misconduct" because "[w]ithout the [failed bank]'s wrongdoing, the [plaintiffs] would have no right to cancel and therefore no claim"].)

This result is faithful to the purpose of FIRREA's exhaustion requirement. Congress adopted a statutory scheme that provides the FDIC,

11

with its vast regulatory experience in a heavily regulated area of federal law, an opportunity to determine claims of wrongdoing against a failed bank in the first instance in an expedited administrative proceeding. To allow a plaintiff to bypass the FDIC's administrative process when suing a successor bank for claims "related to" the alleged wrongdoing of a failed bank would thwart this carefully crafted scheme. (See *Farnik, supra*, 707 F.3d at p. 723 [recognizing "that strategic case captioning would allow creditors to completely bypass FIRREA's administrative process"].) Such a result " 'would encourage the very litigation that FIRREA aimed to avoid.' " (*Oakwood, supra*, 539 F.3d at p. 386.) Courts must exercise caution not to exceed the jurisdictional limitations Congress has placed on them, for to do so risks upsetting the role Congress has given to the FDIC in adjudicating such claims, a body whose responsibilities are integral to the stability of the nation's banking system.

In his opening brief, Kaye notes in passing that FIRREA applies only to claims that are "susceptible of resolution through the claims procedure." (*Henderson v. Bank of New England* (9th Cir. 1993) 986 F.2d 319, 321.) But Kaye makes no argument why his claims of wrongdoing by WaMu would not have been susceptible of resolution through the FDIC's administrative claim process. (12 U.S.C. § 1821(d)(3)–(8).) By failing to make any meaningful argument on this point, Kaye has forfeited it. (*Blizzard Energy, Inc. v. Schaefers* (2021) 71 Cal.App.5th 832, 854.) We therefore conclude that the trial court correctly sustained the demurrer under FIRREA.

Finally, the trial court did not abuse its discretion by denying leave to amend. In an earlier ruling on Chase's motion for judgment on the pleadings as to the *first* amended complaint, the trial court granted Kaye leave to amend to cure the FIRREA jurisdictional bar. Kaye then filed the second

amended complaint that is the subject of this appeal. Thus, Kaye already had an opportunity to amend his complaint to cure the FIRREA problem, yet he was unable to do so. If Chase's alleged wrongdoing was truly independent of WaMu's, Kaye could easily have removed all his allegations of wrongdoing by WaMu to plead around the FIRREA exhaustion requirement. He failed to do so, and it is not our task to try to rewrite his complaint for him. (*Rakestraw v. California Physicians' Service* (2000) 81 Cal.App.4th 39, 44 ["neither the trial court nor this court will rewrite a complaint"].) In ruling on Chase's subsequent demurrer to the second amended complaint, the trial court correctly noted that Kaye had failed to show how he could amend the complaint further to cure the pleading deficiency. On appeal, Kaye has still failed to demonstrate how he could do so. In these circumstances, the trial court acted within its discretion in denying leave to amend. (See *Hendy v. Losse* (1991) 54 Cal.3d 723, 742 ["The burden is on the plaintiff . . . to demonstrate the manner in which the complaint might be amended"]; *Summerfield v. City of Inglewood* (2023) 96 Cal.App.5th 983, 992 [on appeal from judgment of dismissal after demurrer is sustained without leave to amend, "appellants shoulder the burden to show a reasonable possibility the operative complaint can be amended to state a cause of action"].)

## DISPOSITION

The judgment is affirmed.  Respondent is entitled to recover its costs on appeal.

BUCHANAN, J.

I CONCUR:


O'ROURKE, Acting P. J.

14

Dato, J., Dissenting.

Plaintiff Marc D. Kaye seeks relief against defendant JPMorgan Chase Bank, N.A. (Chase) based on certain misrepresentations he claims were made by Chase after it acquired the assets of a failed institution—Washington Mutual Bank (WaMu). The acquired assets included two of Kaye's loans originally made by WaMu. Kaye was thrown out of court at the pleading stage after the trial court sustained Chase's demurrer without leave to amend on the ground that Kaye failed to exhaust his administrative remedies with the Federal Deposit Insurance Corporation (FDIC) under the applicable federal statute.[1] But federal law is clear—indeed, the majority opinion concedes—that FIRREA's administrative exhaustion requirement "does not apply to all claims against a successor bank involving loans issued by a failed bank" and that the FDIC has no role in adjudicating " '[c]laims of independent misconduct by an institution that purchases a failed bank.' " (Maj. opn., *ante*, at p. 9, quoting *Benson v. JPMorgan Chase Bank, N.A.* (9th Cir. 2012) 673 F.3d 1207, 1215 (*Benson*).)

Thus, the question presented by this appeal is whether Kaye's second amended complaint (SAC) alleges "independent misconduct" by Chase, and that turns on how we read the complaint. The principles guiding our review are venerable and well settled, expressing our strong preference for adjudicating the merits of a claim where there is any possibility it is a valid one. Despite any pleading flaws, the complaint must be given a liberal construction, and all doubts are resolved in favor of the plaintiff.

These principles should be more than platitudes. Whatever else it may do, I believe Kaye's SAC clearly alleges a claim for independent post-

---

[1] The administrative exhaustion requirement is found at 12 U.S.C. § 1821(d)(13)(D)(ii), a part of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA).

acquisition misconduct by Chase such that at least some portion of it should survive demurrer. Because the majority opinion effectively honors these tested principles of review only in the breach, I respectfully dissent.

A

California's public policy favoring the resolution of disputes on their substantive merits is so strong, longstanding, and ubiquitous that it hardly requires citation for support. (See generally *Weitz v. Yankosky* (1966) 63 Cal.2d 849, 855 ["the policy of the law is to have every litigated case tried upon its merits"]; see also *Fasuyi v. Permatex, Inc.* (2008) 167 Cal.App.4th 681, 696 [characterizing the policy of resolving cases on their merits as "[t]he most fundamental"].) The policy manifests itself in numerous ways. It is expressly characterized as stronger than countervailing policies that foster speed and efficiency in the processing of cases. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 566.) Procedural defaults are disfavored (*Elkins v. Superior Court* (2007) 41 Cal.4th 1337, 1364) so that we scrutinize trial court orders that deny relief from procedural default more closely than those which grant it (*Luxury Asset Lending, LLC v. Philadelphia Television Network, Inc.* (2020) 56 Cal.App.5th 894, 907).

In particular, the policy affects how we review pretrial motions that would have the effect of precluding a trial on the merits. Orders sustaining demurrers without leave to amend and granting motions for summary judgment "deprive[] the losing party of a trial on the merits" and should therefore be "used with caution, so that [they do] not become a substitute for trial." (*Molko v. Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107 [summary judgment]; see also *Del Mar Beach Club Owners Assn. v. Imperial Contracting Co.* (1981) 123 Cal.App.3d 898, 909 [demurrer].) On a motion for summary judgment, for instance, the moving party bears the initial burden of

2

establishing that the opposing party cannot prevail (see, e.g., *Estuary Owners Assn. v. Shell Oil Co.* (2017) 13 Cal.App.5th 899, 911); the evidence submitted by the moving party must be strictly construed and that of the nonmoving party liberally construed, with any doubts "resolved in favor of the party opposing the motion." (*Molko*, at p. 1107; *O'Riordan v. Federal Kemper Life Assurance Co.* (2005) 36 Cal.4th 281, 284.) Similarly on demurrer, a court must accept as true the facts as pleaded and liberally construe the allegations in the plaintiff's favor so as to state a valid cause of action. (*King v. Central Bank* (1977) 18 Cal.3d 840, 843; *Minsky v. City of Los Angeles* (1974) 11 Cal.3d 113, 118; see also Code Civ. Proc., § 452.)

B

The substantive federal law against which we measure the SAC is not seriously disputed by the parties. FIRREA creates an administrative process that requires the FDIC to review and resolve claims against the assets of a failed bank. (*Superior Banks*, *FSB v. Boyd* (*In re Lewis*) (6th Cir. 2005) 398 F.3d 735, 739–740.) It limits the jurisdiction of courts "to review FIRREA claims 'relating to any act or omission' of a failed bank or of the FDIC as receiver of a failed bank unless they are first subjected to FIRREA's administrative claims process." (*Farnik v. FDIC* (7th Cir. 2013) 707 F.3d 717, 722, citing 12 U.S.C. § 1821(d)(13)(D)(ii).) Kaye did not pursue any administrative claims process before filing his lawsuit. The crucial question we must decide is whether all of Kaye's claims are, in reality, claims against WaMu (the failed bank), or whether he has alleged any claim of "independent misconduct" against Chase.

As pertinent to the pleading issue in this case, the substantive law we must apply is articulated in three of the earliest federal circuit court decisions to construe the administrative exhaustion requirement in 12 U.S.C.

3

section 1821.  In *Village of Oakwood v. State Bank & Trust Co.* (6th Cir. 2008) 539 F.3d 373, some uninsured depositors in a failed bank brought an action against a successor bank for aiding and abetting an alleged breach of fiduciary duty by the FDIC as receiver for the failed bank.  (*Id.* at p. 376.) Plaintiffs argued they only named the successor bank and not the FDIC so that the exhaustion requirement did not apply.  (*Id.* at p. 386.)  Rejecting this contention, the Sixth Circuit held that because all claims against the successor were "directly related to acts or omissions of the FDIC as the receiver" (*ibid.*), plaintiffs were required to first pursue their administrative remedy.

The type of claim at issue in *Oakwood* was distinguished in *American National Ins. Co. v. FDIC* (D.C. Cir. 2011) 642 F.3d 1137 (*American National*).  In that case, which like this one involved the failure of WaMu, bondholders of the failed bank alleged that Chase (the successor bank) manipulated the FDIC to seize WaMu, allowing Chase to strip the assets without any of the liabilities "for a drastically undervalued price."  (*Id.* at p. 1139.)  As in *Oakwood*, defendants argued that FIRREA's administrative exhaustion requirement barred the claims because they "relate[d] to" an act of the FDIC as receiver—the sale of WaMu's assets to Chase.  (*American National*, at p. 1141.)  But the District of Columbia Circuit disagreed, concluding that the plaintiffs' lawsuit was "against a third-party bank for its own wrongdoing, not against the depository institution for which the FDIC is receiver (i.e., Washington Mutual)."  (*Id.* at p. 1142.)  It concluded that *Oakwood* was "clearly distinguishable" because there, "the wrongdoing alleged was perpetrated by the FDIC-as-receiver, which the assuming bank allegedly aided and abetted."  (*American National*, at p. 1144.)  In contrast, the plaintiffs in *American National* alleged that Chase "itself committed the

4

tortious acts for which they claim relief." (*Ibid.*) Although the claim was "relate[d] to" conduct by the FDIC in the sense that the plaintiffs would have suffered no damage but for the FDIC's involvement, "that actions by the FDIC form one link in the causal chain connecting JPMC's wrongdoing with appellants' injuries is insufficient to transform the complaint into one against the FDIC."[2] (*American National*, at p. 1141; see *id.* at p. 1144.)

The principles governing the permissible allegation of "independent misconduct" by a successor bank were synthesized by the Ninth Circuit Court of Appeals in *Benson*, *supra*, 673 F.3d 1207, a case that arose out of a notorious Ponzi scheme allegedly aided and abetted by WaMu before it was seized by the FDIC. The Ponzi scheme was exposed several months after Chase acquired WaMu's assets, and the complaint only generally alleged that Chase "continued WaMu's problematic practices following assumption." (*Id.* at p. 1209; see also *id.* at p. 1211.) Citing both *Oakwood* and *American National*, the Ninth Circuit stated that "a claim asserted against a purchasing bank based on the conduct of a failed bank must be exhausted under FIRREA." (*Benson*, at p. 1209.) But, the court explained, "[t]he same is not true . . . with respect to claims based on a purchasing bank's post-purchase actions." (*Ibid.*) Such claims—that is, claims of "independent

---

2      Significantly, defendants in *American National* argued that because plaintiffs' complaint could be read to allege a conspiracy between Chase and the FDIC to commit tortious acts, it was necessarily subject to the exhaustion requirement based on *Oakwood*. Again, the District of Columbia Circuit disagreed. Even assuming the legal premise for defendants' argument—that a conspiracy pleading should be treated the same as the aiding-and-abetting allegations in *Oakwood*—"the procedural posture of this case requires us to construe the complaint liberally, in the light most favorable to appellants." Doing so, it "read the complaint to allege that [Chase] alone committed the wrongdoing for which appellants sue and find no agreement between [Chase] and the FDIC." (*American National*, *supra*, 642 F.3d at p. 1144.)

misconduct" by the purchasing bank—"are not covered by FIRREA's exhaustion requirement." (*Id.* at p. 1215.)

Even though "a plaintiff may sue based on a purchasing bank's own wrongdoing without attempting to exhaust FIRREA administrative remedies," the *Benson* court went on to analyze whether the plaintiffs in that case had adequately alleged Chase's "independent misconduct." (*Benson*, *supra*, 673 F.3d at p. 1216.) Because plaintiffs' complaint included only "conclusory allegations" that "unidentified 'practices continued' after acquisition," this was insufficient to state a claim for "independent misconduct." (*Id.* at p. 1217.) Indeed, "plaintiffs fail[ed] to allege a single specific act taken by the purchasing bank." (*Ibid.*) Critically, this independent misconduct claim was not rejected on grounds that the plaintiffs had failed to exhaust their administrative remedies, but rather because they had failed to plead more than unsupported conclusions.

In short, a claim against the successor bank is subject to the administrative exhaustion requirement if it is based on alleged misconduct by the failed bank or the FDIC (as receiver), for which the plaintiff claims the successor bank is in some way responsible. On the other hand, the successor bank may be sued directly for independent misconduct it allegedly committed *after* it took control of the failed bank's assets. And this is true despite the fact that the successor bank's alleged misconduct is *related to* actions by the failed bank such that the plaintiff would not have been harmed by the independent misconduct *but for* the prior actions of the failed bank. To be sufficient, allegations of independent misconduct must be more than conclusory.

C

6

Does the SAC, liberally construed in plaintiff's favor and resolving all doubts to support the pleading, fairly allege a claim of "independent misconduct" by Chase? Kaye asserts that the FDIC took over as receiver for WaMu on September 28, 2008 and on the same day "transferred substantially all WaMu's assets and liabilities to JPMorgan Chase Bank." More than a month later, on October 31, 2008, Chase issued a press release making certain representations to former WaMu customers whose loans Chase had recently acquired. It is these post-acquisition representations that Kaye alleges Chase did not fulfill. As pleaded, these representations were in no way mandated by the terms of its agreement with the FDIC, nor did they merely repeat representations that WaMu previously made to its customers. In a word (or two), they were allegations of "independent misconduct" by Chase, undertaken for its own independent business purposes.

Emphasizing language from the Ninth Circuit's *Benson* decision taken out of context, the majority opinion suggests that because Kaye's claims "relate to" the acts or omissions of WaMu, they are not based "only" on post-purchase misconduct by Chase. (See maj. opn., *ante*, at pp. 8–9.) But it is critical to appreciate that the plaintiffs' allegations of post-purchase misconduct in *Benson* did not merely "relate" in some general sense to the pre-purchase misconduct of WaMu. Rather, they claimed that Chase continued the *same* complicit conduct previously engaged in by WaMu, which assisted in the Ponzi scheme. Yet even then, the Ninth Circuit did not approve dismissal of the allegations in that case based on the administrative exhaustion requirement. It found that the exhaustion requirement did *not* apply, but went on to separately conclude that the plaintiffs' complaint had failed to offer anything more than conclusory allegations. (*Benson*, *supra*, 673 F.3d at pp. 1216–1217.)

7

Indeed, *Benson* plainly rejects a test that would apply the administrative exhaustion requirement of section 1821(d)(13)(D)(ii) to any claim against a successor bank which broadly "relates to" the conduct of the failed bank. This was the faulty reasoning employed by the federal district court in *Benson*,[3] an analysis that the Ninth Circuit expressly disapproved as a "misinterpret[ation] of the operative language" of the statute. (*Benson, supra*, 673 F.3d at p. 1215 ["We disagree with the district court's analysis"].) The appeals court concluded that while "[t]he *acts* of the purchasing bank might be related to the *acts* of the failed bank, . . . FIRREA's jurisdictional bar applies when a *claim* relates to the *acts* of a failed bank." (*Id.* at p. 1216.)

Here, Chase's October 31 press release highlighted in the SAC was a "specific act taken by the purchasing bank." (*Benson, supra,* 673 F.3d at p. 1217.) In some sense it "related to" the prior *acts* of WaMu in that the representations it made were directed to the former WaMu customers and concerned loans originated by WaMu. But all that is background and context. The *claims* pleaded by Kaye are in no way "wholly dependent upon [WaMu's] wrongdoing." (*Tellado v. IndyMac Mortg. Servs.* (3d Cir. 2013) 707 F.3d 275, 280.) Indeed, to succeed they do not require proof of *any* wrongdoing by WaMu because they are not based on anything WaMu did or did not do. Rather, the claims focus on Chase's independent post-purchase decision to make *additional* promises and give *additional* assurances to these customers, promises and assurance Kaye contends were unfulfilled. Whether

---

[3] "[T]he [district] court held that even if the complaints 'include stand-alone allegations of post-receivership misconduct by [Chase], FIRREA still applies' because the phrase 'relating to' as used in [section] 1821(d)(13)(D)(ii) 'has a deliberately broad and sweeping meaning.' " (*Benson, supra*, 673 F.3d at p. 1215.)

he is right or wrong goes to the merits of his claim. It is not a pleading issue that can or should be resolved on demurrer.

The SAC alleges that most of WaMu's adjustable rate mortgage loans were negatively amortized, meaning that the minimum monthly payments "did not cover even the interest owed, much less the principal." It goes on explain that "[n]egative amortize[ed] loans are often considered 'predatory loans' as they place the borrower in a high probability of default." The majority opinion emphasizes these allegations, which it treats as compelling evidence that Kaye is really complaining about WaMu's misconduct and not that of Chase. It suggests that by characterizing the WaMu loans as "predatory," Kaye's claims necessarily depend on a finding of WaMu's underlying liability.

I read these relatively short (four paragraphs) allegations about WaMu quite differently. They are intended to provide background and context for the lengthier (14 paragraphs) allegations about Chase's independent misconduct, separately captioned as relating to its "October 31, 2008 promises to assist borrowers with offers and to eliminate negative amortization loans." All references to "predatory" loans could be removed without doing violence to the substance of the SAC. Kaye does not seek to make Chase responsible for whether his or any other loan was "predatory." Rather, the SAC claims Chase is responsible for its *own* independent failure to fulfill new representations it made after it purchased Kaye's loans.

This is but one instance where our obligation to liberally construe the complaint in plaintiff's favor should resolve the interpretational issue so as to permit a hearing on the merits of the claim. I can appreciate that one person's background and context is another's substance, but it is a well-settled principle of California law that "precise form and language are not

9

essential" in the drafting of a complaint. (*Scott v. City of Indian Wells* (1972) 6 Cal.3d 541, 549.)  More than a century ago, the California Supreme Court articulated the time-tested principles that must guide our decision here: "In determining whether or not the complaint is sufficient, as against the demurrer . . . , the rule is, that if . . . it appears that the plaintiff is entitled to any relief at the hands of the court against the defendants, the complaint will be held good, although the facts may not be clearly stated or may be intermingled with a statement of other facts irrelevant to the cause of action shown, or although the plaintiff may demand relief to which he is not entitled under the facts alleged." (*Matteson v. Wagoner* (1905) 147 Cal. 739, 742.)

The Ninth Circuit in *Benson* applied the same pleading principles in the specific context of section 1821(d)(13)(D)(ii).  In asserting that plaintiffs were barred by their failure to exhaust administrative remedies, Chase argued it was dispositive that the complaint "advanced claims with allegations of misconduct by both WaMu and [Chase]." (*Benson, supra*, 673 F.3d at p. 1216.)  Rejecting this contention, the *Benson* court observed that "a plaintiff's decision to include allegations about both the failed bank and the purchasing bank in a single complaint does not require a court to treat those allegations in the same manner." (*Ibid.*)  Instead, the court may simply "dismiss those portions of a claim that are barred while permitting the remaining portion of a claim to go forward." (*Ibid.*)

That should be the result in this case.  It should make no difference that Kaye could have used more precise language in drafting a better complaint.  It should make no difference that there are ambiguities in the allegations, or that he has included irrelevant facts.  It should make no difference even if some of us believe he has attempted to plead an invalid claim.  What matters is whether he has alleged or could allege *any* facts that

10

constitute a valid cause of action.  In my view, he has clearly demonstrated an ability to allege one of more causes of action based on independent post-purchase misconduct by Chase sufficient to withstand a demurrer.

I would reverse with directions to overrule the demurrer.


DATO, J.